UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Lomree, Inc.,

       Plaintiff,

v.

Pan Gas Storage, LLC,

       Defendant.

_____/

Case No. 10-14425

Honorable Nancy G. Edmunds

**OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT [25] AND GRANTING PLAINTIFF'S REQUEST FOR SUMMARY JUDGMENT
PURSUANT TO FED. R. CIV. P. 56(f)(1) [26]**

Plaintiff Lomree, Inc., a Michigan corporation ("Lomree"), filed this action against
Defendant Pan Gas Storage, LLC, d/b/a Southwest Gas Storage, a Delaware limited
liability company authorized to do business in Michigan ("Pan Gas"), alleging breach of
two nearly identical contracts related to the natural gas rights of two parcels owned by
Lomree.  This matter comes before the Court on Pan Gas's motion for summary
judgment.  For the reasons set forth below, Pan Gas's motion is DENIED and judgment
is entered in favor of Lomree pursuant to Fed. Civ. P. 56(f)(1).

**I.      Facts**

This case involves the interpretation of a series of contracts entered into by
Lomree and Pan Gas's predecessors in 1946 and 1957-58 related to two separate

1

parcels owned by Lomree.[1]  The contracts for the two parcels are identical in all critical aspects and will be analyzed together.  The dispute before this Court is whether the right to natural gas at no cost ("free gas") identified in the 1946 Contracts was preserved as ongoing consideration or extinguished in the later 1957-58 contracts.

**A.     The 1946 Contracts**

The purpose of the 1946 Contracts was to grant Pan Gas the right to mine the natural gas underneath Lomree's two parcels.  (Pl.'s Mot. at 1).  In addition to royalty payments, which are not at issue, the consideration for the 1946 Contracts was for Lomree to have access to natural gas free of charge in exchange for granting Pan Gas its mineral rights, as identified in the following provision:

> …[Lomree] to have gas free of charge from any gas well on the leased premises for all stoves and inside lights in the principal dwelling house on said land by making his own connections with the well at his own risk and expense.

(Def.'s Ex. 1, A,F, ¶ 3(2nd)).  The parties agree that this provision gave Lomree the right to free gas from the signing of the contracts in 1946 until the 1957-58 contracts.  (Def.'s Answer ¶11, 15).

---

[1] Between the 1946 and 1957-58 contracts, the parties entered into two additional sets of contracts which are not at issue:  "Option to Purchase Natural Gas In Place And To Acquire Storage Rights" (Def.'s Ex. B,G) and "Notice of Exercise of Option to Purchase Natural Gas In Place And To Acquire Storage Rights" (Def.'s Ex. C,H).

While the contracts in this case were entered into by the predecessors of the parties, their predecessors will simply be referred to by the names of the parties presently before this Court.

**B.     The Wells Run Dry and Are Used for Storage**

At some point in the 1950s, the wells beneath Lomree's property ran dry of natural gas.  Lomree contends that its wells were "tapped out by the mid-1950s" while Pan Gas states that as early as 1955 or 1956, the wells were no longer productive on a commercial scale.  (Pl.'s Mot. at 1; Def.'s Mot. at 12).

Some time after the wells ran dry, Pan Gas began storing natural gas extracted from other locations beneath Lomree's parcels.  Lomree states that Pan Gas began storing gas after the wells were tapped out in the mid-1950s, but does not provide a specific date, while Pan Gas declares that storage did not begin until after the next set of contracts were executed in 1957.  (Pl.s Mot at 1, 3, 4; Def.'s Reply 3).  It is unclear whether storage began before or after the 1957 Contracts.

**C.     The 1957 Contracts**

The purpose of the 1957 Contracts, titled "Gas Storage Agreement and Oil and Gas Lease" ("The 1957 Contracts"),  was to use the "tapped out space" below Lomree's parcels as a storage area for natural gas that Pan Gas mined from other properties. (Pl.'s Mot. at 1; Def.'s Ex. 1, E,J).  The 1957 Contracts contain the following text in ¶15:

> This lease supersedes and cancels...[the 1946 Contracts];
> provided, however, that if any well or wells has or have been
> drilled under the terms of said lease, such well or wells and
> any personal property used or obtained in connection
> therewith shall be included in the terms and provisions of this
> lease.

(Def.'s Ex. 1, E,J, ¶ 15).   The parties dispute this provision's meaning and the consideration under the 1957 Contracts.  While they agree that the items listed in ¶¶ 4

3

and 5 of the 1957 Contracts (a nominal annual rental payment and the potential for further royalties and payments) constitute part of the consideration, they disagree as to whether ¶ 15 extinguished or preserved the right to free gas originating from the 1946 Contracts.

### D.      The 1957-58 Conveyances

Shortly after the 1957 Contracts, the parties entered into an identical pair of "Natural Gas Conveyances" with respect to the two parcels in 1957 and 1958 ("The 1957-58 Conveyances").  (Def.'s Ex. 1, D,I).  In consideration for one-time payments, Lomree conveyed to Pan Gas "all of the natural gas in and under the following described land…"  (*Id.*).

### E.      The Parties' Course of Performance

From 1957 until 2010, Lomree continued to receive free gas from Pan Gas.  In 2010, Pan Gas notified Lomree that it would no longer provide Lomree with free gas, prompting this action.[2]  (Pl.'s Mot. at 2, Def.'s Answer ¶11, 16).

## II.     Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A moving party may meet that burden "by 'showing' – that is, pointing out to the district court -- that there is an absence of

---

[2] The parties have agreed to continued access to the free gas pending the resolution of this action.  (Def.'s Ex. 2).

4

evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

When the moving party has met its burden under rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike County Bd. Of Education*, 286 F.3d 366, 370 (6th Cir. 2002).

"When a party has moved for summary judgment, and the Court agrees that there is no genuine dispute of material fact, but believes that judgment as a matter of law is appropriate for the non-moving party, the Court is free to so declare." *Markva v. Haveman*, 168 F. Supp. 2d 695, 706-07 (E.D. Mich. 2001) *aff'd*, 317 F.3d 547 (6th Cir. 2003).

**III.   Analysis**

After considering both parties' arguments, this Court finds that the language in ¶ 15 of 1957 Contracts is ambiguous, and that Pan Gas's arguments against Lomree's interpretation do not make the contracts unambiguous in its favor.   Since ¶ 15 of the 1957 Contracts is ambiguous, the Court considers the parties' course of performance to aid in determining the parties' intent and applies the doctrine of *contra proferentem*. After doing so, the Court determines that the contracts preserve Lomree's right to free gas.

5

## A.   Pan Gas's Interpretation of the Contracts

Pan Gas contends that the right to free gas in the 1946 Contracts was extinguished by the 1957 Contracts, or alternatively, conveyed by Lomree to Pan Gas through the 1957-58 Conveyances.  (Def.'s Mot. at 14).

Pan Gas claims that the critical language of ¶ 15 of the 1957 Contracts ("such well or wells and any personal property used or obtained in connection therewith") refers to the equipment or structures used by Pan Gas in its prior extraction of oil on the parcels under the 1946 Contracts.  (Def.'s Mot. at 8).  Pan Gas claims the language in ¶ 15 was necessary to allow it to continue to use its equipment on Lomree's parcels for storage purposes without losing ownership due to the cancellation of the 1946 Contracts in the 1957 Contracts.[3]  (Def.'s Mot. at 9).

Pan Gas asserts that Lomree's free gas interpretation of ¶ 15 is unreasonable for two reasons.  Pan Gas first claims that Lomree's interpretation is inconsistent and conflicts with other provisions of the 1957 Contracts and 1957-58 Conveyances.  These arguments are: (1) providing free gas would conflict with ¶¶ 4 and 5 of the 1957 Contracts, wherein all methods of payment were stated; (2) providing free gas would conflict with the 1957-58 Conveyances, which stated that Lomree would not be entitled to royalties for natural gas (free gas was allegedly considered a royalty under the 1946 Contracts); (3) providing free gas would be inconsistent with the 1957-58 Conveyances,

---

[3] Such equipment is considered personal property under Michigan law, and reverts to the lessor if the lessee fails to remove it within a reasonable time following the termination of an oil and gas lease.  *See Cameron v. Oakland County Gas & Oil Co.*, 269 N.W. 227 (Mich. 1936); *Toles v. Maneikis*, 412 N.W.2d 263 (Mich. Ct. App. 1987).

6

whereby Lomree conveyed to Pan Gas "all of the natural gas" on its parcels and; and (4) unlike the 1946 Contracts, the 1957 Contracts only specified free gas for Pan Gas, not Lomree.  (Def.'s Mot. at 10-11).

Pan Gas's second argument is that Lomree's interest in free gas under the 1946 Contracts was an interest in real property and not personal property.  Consequently, Pan Gas argues that Lomree's interest in free gas was extinguished in the 1957 Contracts, which cancelled the 1946 Contracts and only preserved items of personal property.  (Def.'s Mot at 11-14).  Pan Gas characterizes Lomree's interest as a "reservation of an interest in gas in place" constituting a covenant running with the land and cites case law holding that gas in place (non-extracted gas) is considered a real property interest, as opposed to personal property.[4]  (Def.'s Mot. at 11).  Pan Gas alternatively argues that upon the cancellation of the 1946 Contracts under the 1957 Contracts, the interest in free gas reverted to Lomree, but was then conveyed away to Pan Gas as part of the 1957-58 Conveyances, which included "all of the natural gas in and under" Lomree's parcels (Def.'s Mot. at 14).

### B.    Lomree's Interpretation of the Contracts

Lomree interprets ¶ 15 of the 1957 Contracts ("such well or wells and any personal property used or obtained in connection therewith") as referring to the gas stored by Pan Gas on its property, and references case law stating that stored gas is

---

[4] *See Eadus v. Hunter*, 256 N.W. 323, 325 (Mich. 1934) ("Oil and gas, until severed from the containing soil, are a part of the realty"); *Jaenicke v. Davidson*, 287 N.W. 472, 474 (Mich. 1939) ("oil and gas are a part of the realty until severed therefrom").

7

personal property.[5]  (Pl.'s Mot. at 3).  Since it obtained stored gas in connection with the wells on its property, Lomree claims that this personal property was preserved in ¶ 15 as ongoing consideration.  (*Id.*).

Lomree also claims that to deny it continued access to free gas would allow Pan Gas to avoid paying fair value for use of Lomree's property, since the right to free gas formed a significant amount of the consideration in the 1957 Contracts, with the only other consideration being an annual nominal rental fee of $246.  (Pl.'s Mot. at 6, 8).

As for Pan Gas's argument that Lomree's interpretation is inconsistent and conflicts with other provisions of their contracts, Lomree argues:  (1) any notion of "full payment" in ¶¶ 4 and 5 of the 1957 Contracts is not dispositive; (2) the right to free gas is not a "royalty" payment; (3) while Lomree conveyed to Pan Gas the gas under its properties in the 1957-58 Conveyances, it is not now making a claim to such gas but rather gas transported to and stored under their parcels by Pan Gas from other properties; and (4) whether the 1957 Conveyances provided the right to Lomree for free gas is a matter of contractual interpretation for this Court.  (Pl.'s Mot. at 7-8).

Lomree also argues that should the Court find the contracts to be ambiguous, the course of performance between the parties confirms that their interpretation is correct, and that that under the doctrine of *contra proferentem*, the Court should construe ambiguities against their drafter, which in this case was Pan Gas.  (Pl.'s Mot. at 6-7).

---

[5] *See ANR Pipeline Co. v. 60 Acres of Land*, 418 F. Supp. 2d 933, 940 (W.D. Mich. 2006) ("Once severed from the realty, gas becomes personal property, and title to that property is not lost when it is injected into underground storage reservoirs").

Lastly, in addition to denying Pan Gas's Motion for Summary Judgment, Lomree asks the Court to enter summary judgment in its favor pursuant to Fed. R. Civ. P. 56(f)(1).[6]  (Pl.'s Mot. at 9).

### C.    The Court's Interpretation of the Contracts

Having considered both parties' arguments, the Court will now perform its own analysis of the Contracts.   The Court finds that the language of ¶ 15 of the 1957 Contracts is ambiguous.   Since ¶ 15 is ambiguous, the Court considers the parties' course of performance and applies the rule of *contra proferentem*, which leads to the conclusion that Lomree's right to free gas is preserved.

### 1.    Michigan Contract Law Applies

The traditional rules of construction under Michigan contract law apply to this case:[7]  if a contract is clear and unambiguous, the Court must enforce it as written, according to its plain and ordinary meaning, *Clevenger v. Allstate Ins. Co.*, 505 N.W.2d 553, 557 (Mich. 1993), and not consider extrinsic evidence. *Upjohn Co. v. New Hampshire Ins. Co.*, 476 N.W.2d 392, 396 n. 6 (Mich.1991).  A contract is unambiguous

---

[6] The most recent version of Fed. R. Civ. P. 56(f)(1), effective December 1, 2010, states that "After giving notice and a reasonable time to respond, the court may…grant summary judgment for a nonmovant."

[7] *See NILAC Int'l Mktg. Group v. Ameritech Services, Inc.*, 362 F.3d 354, 358 (6th Cir. 2004) ("As a federal court sitting in diversity, we apply the choice-of-law provisions of the forum state…Where, as here, a contract contains no express choice-of-law provision, Michigan courts apply the law of the forum state unless (1) there is no substantial relationship between the forum state and the contract or (2) the application of the forum state's law would conflict with a policy prerogative of a state with a greater interest in the contract than the forum state.")

if it has only one reasonable interpretation, but is ambiguous if it is subject to two or more reasonable interpretations. *Petovello v. Murray*, 362 N.W.2d 857, 858 (Mich. Ct. App. 1984).

The Court is obliged to enforce a contract according to the parties' intent. *Quality Products & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 259 (2003). In deciphering the parties' intent, the Court must consider the contract as a whole. *Harlow v. Lake Superior Iron Co.*, 36 Mich. 105, 110 (1877). If a writing is unambiguous, the contractual language is the best way to determine the parties' intent. *Klapp v. United Ins. Group Agency, Inc.*, 663 N.W.2d 447, 457 (2003). However, if the text is ambiguous, the Court may consider extrinsic evidence to decipher the parties' intent. *O'Connor v. March Automatic Irr. Co.*, 218 N.W. 784, 787 (Mich. 1928). Finally, if after applying all other conventional means of contract interpretation, including the consideration of extrinsic evidence, the terms are still ambiguous, the rule of *contra proferentem* applies, which holds that ambiguities are to be construed against their drafter. *Klapp*, 663 N.W.2d at 455.

Special rules of construction also exist for interpreting oil and gas leases under Michigan law: the Court must read such a lease "not only according to its words, but in connection with the purpose of its clauses," and must construe them "for the benefit of the lessor and against the lessee." *J.J. Fagan & Co. v. Burns*, 226 N.W. 653, 654-55 (Mich. 1929). The Court will now interpret the contracts considering the above-stated rules.

10

### 2.     Paragraph 15 of the 1957 Contracts is Ambiguous

Michigan contract law is clear that gas in-place is real property, while gas extracted from the ground is personal property.  *Eadus*, 256 N.W. at 325; *ANR Pipeline Co.*, F. Supp. 2d at 940.  The Court must determine whether the following language of ¶ 15 of the 1957 Contracts preserves Lomree's right to free gas from the 1946 Contracts:

> This lease supersedes and cancels...[the 1946 Contracts]; provided, however, that if any well or wells has or have been drilled under the terms of said lease, such well or wells and any personal property used or obtained in connection therewith shall be included in the terms and provisions of this lease.

(Def.'s Ex. 1, E,J, "¶ 15").  Paragraph 15 specifically references wells that have been drilled under the 1946 Contracts' terms, and any personal property obtained in connection with such wells.  The facts indicate that the wells originally drilled under the terms of the 1946 Contracts became tapped out sometime in the "mid-1950s" and that sometime thereafter, Pan Gas began storing gas on Lomree's property.  (Pl.'s Mot. at 1; Def.'s Mot. at 12).  The question for the Court is whether the stored gas was "obtained in connection therewith" the wells on Lomree's parcels within the meaning of ¶ 15.

### a.     Paragraph 15 of t he 1957 Contracts is Subje ct to Multiple Reasonable Interpretations

The Court ultimately finds that ¶ 15 is subject to multiple reasonable interpretations:  the first, urged by Pan Gas, is that Lomree's interest in natural gas under the 1946 Contracts and at the time of the execution of the 1957 Contracts was related to the gas existing in-place below their parcels, which is an interest in real property under Michigan law.  The personal property referenced in ¶ 15 would be Pan

11

Gas's equipment and structures used to extract oil from the wells, which it sought to avoid losing ownership of under the applicable Michigan law.  Under this interpretation, Lomree's interest in free gas would be extinguished, since it was one of real property and did not fall within the ambit of ¶ 15.  This result would be particularly feasible if storage did not begin until after the signing of the 1957 Contracts.

Alternatively, ¶ 15 could reference gas that was extracted from external properties and then stored in the "tapped out" wells drilled under the terms of the 1946 Contracts – gas that would be considered personal property under Michigan law.  This second interpretation would certainly be feasible if gas had been stored prior to the signing of the 1957 Contracts, making such gas personal property obtained "in connection therewith" the wells at the time of the signing of the 1957 Contracts.  However, even if storage did not occur until after the signing of the 1957 Contracts, ¶ 15 does not limit personal property "used or obtained in connection therewith" to personal property already in possession at the time of the execution of the contract.  Paragraph 15 could just as equally apply to personal property obtained through the wells after the signing of the 1957 Contracts – that is, gas extracted off-site and injected into Lomree's parcels after the signing of the 1957 Contracts, thus obtained "in connection therewith" the wells.

> **b.    The Fact that Free Gas Clauses May Constitute Covenants Running With the Land Does Not Make ¶ 15 Unambiguous**

The fact that courts outside of Michigan have treated free gas clauses as covenants running with the land and therefore interests in real property[8] does not make the contracts any more clear, as Pan Gas urges.  Even if Lomree obtained such a covenant, the fact that the covenant itself is an interest in real property does not mean that the covenant cannot refer to items of personal property that touch and concern the land, such as oil stored in the wells on Lomree's parcels.[9]  If treated as a covenant running with the land that was an interest in real property, Lomree's covenant would have initially related to gas underneath Lomree's parcels (real property) and later gas extracted elsewhere and stored on Lomree's parcels (personal property).[10]

### c.   Considering the Contracts as a Whole, Free Gas Likely Formed a Significant Portion of the Consideration Under the 1957 Contracts

---

[8] *See Patrick v. Allen*, 350 S.W.2d 481 (Ky.,1961), *Thomas v. Thomas*, 767 S.W.2d 507 (Tex. Ct. App. 1989).  There does not appear to be a case in Michigan dealing with free gas clauses.

[9] In *Greenspan v. Rehberg*, 224 N.W.2d 67 (Mich. Ct. App. 1974) the Court identified the requirements for a covenant to run with the land as (1) that the parties intended that the covenant run with the land, (2) that the covenant affect or concern the land with which it runs, and (3) that there is privity of estate between the parties.  *Id.* at 73.  The Court further explained that "in order that a covenant may run with the land, its performance or nonperformance must affect the nature, quality, or value of the property demised, independent of collateral circumstances, or must affect the mode of enjoyment."  *Id.*  Nowhere is it stated that the object that must affect the nature or quality of the land must be an item of real property, as opposed to personal property (e.g. extracted and stored oil).

[10] This Court need not join other states in declaring that a free gas clause necessarily constitutes a covenant running with the land in order to resolve this case.

13

This Court must consider the 1957 Contracts as a whole to decipher the parties' intent. *Harlow*, 36 Mich. at 110. Following this rule, the Court finds that Lomree's argument that discontinuing their access to free gas would allow Pan Gas to avoid paying fair value for the use of the property is persuasive. While generally courts will not assess the sufficiency of consideration in an agreed exchange, "equity will, however, grant relief where the inadequacy of consideration is particularly glaring." *Rose v. Lurvey*, 198 N.W.2d 839, 841 (Mich. Ct. App. 1972). Moreover, this Court is not necessarily gauging the sufficiency of the parties' consideration but rather attempting to determine whether free gas is a component of their consideration.

While the 1957 Contracts do contain other items of consideration, the only ones that are certain are the nominal annual payments in ¶¶ 4 and 5(d), which Lomree claims constitute $246 annually. (Pl.'s Mot. at 6). The other items of consideration in ¶ 5(a)-(c) only apply if Pan Gas were to discover and produce additional gas or oil on Lomree's parcels.[11] Since Lomree's parcels were likely "tapped out" by the mid 1950s, or at the very least not productive on a commercial scale, (Pl.'s Mot. at 1; Def's Mot. at 12), it is unlikely that Lomree would benefit from these provisions. Considering ¶¶ 4, 5, and 15 of the 1957 Contracts as a whole, it appears that continued access to natural gas likely constituted a significant portion of the consideration under the 1957 Contracts.

---

[11] Paragraphs 5(a)-(c) of the 1957 Contracts included (a) royalty payments if Pan Gas discovered commercial quantities of natural gas on Lomree's parcels; (b) payments if Pan Gas discovered non-commercial quantities of natural gas on Lomree's parcels; and (c) the delivery of portions of any oil that Pan Gas produced from Lomree's parcels, or royalty payments in lieu of delivery.

14

Given the factual uncertainty on the record as to when storage began (before or after the 1957 Contracts) and the plausible interpretations of ¶ 15 either way, regardless of the timing of the storage, the Court finds that ¶ 15 is open to multiple reasonable interpretations.

### 3. Pan Gas's Addi tional Arguments Against Lomree's Interpretation of the Contract s Do Not Make th e Contracts Unambiguous in its Favor

The Court finds that Pan Gas's additional arguments against Lomree's interpretation of the contracts are not dispositive and do not make the contracts unambiguous in its favor.

#### a. Payment Can Extend Be yond ¶¶ 4 an d 5 of th e 1957 Contracts and Fr ee Gas Might Not Have Been Contemplated as "Payment"

While Pan Gas claims that ¶¶ 4 and 5 of the 1957 Contracts, which identify forms of payment, constitute all possible methods of payment, this argument fails in two respects. First, while ¶ 4 contains the language "in full payment for the right and privilege of injecting and storing gas," ¶ 5 includes payments "in addition to the payments provided for in paragraph 4." Any full payment language is not conclusive within the 1957 Contracts because as shown in ¶ 5, the "full payment" identified in ¶ 4 can be supplemented. Second, even if ¶¶ 4 and 5 contain all references to "payments," access to free gas may not have been contemplated by the parties as constituting a form of "payment" but rather an additional item of ongoing consideration.

15

b.   **Free Gas Was Not a "Royalty" Under the 1957 Contracts and Was Therefor e Not Wa ived by the 1957-58 Conveyances**

Pan Gas argues that providing free gas would conflict with the 1957-58 Conveyances, which stated that Lomree would not be entitled to royalties for natural gas, and that free gas was considered a royalty under the 1946 Contracts. However, while free gas may have been considered a royalty interest under the 1946 lease, this does not mean that it was a royalty interest under the 1957 Contracts or 1957-58 Conveyances. Under Michigan law, a royalty reserved under an oil and gas lease is "a share of the product or profits reserved by the owner for permitting another to develop his property." *People v. Blankenship*, 8 N.W.2d 919, 921 (Mich. 1943).[12] While oil production occurred on Lomree's property under the 1946 Contracts, no such production occurred under the 1957 Contracts, after which the land was used only for oil storage. Access to free stored gas under the 1957 Contracts is not a royalty payment because it is not associated with oil production on Lomree's property, and is therefore not foreclosed by the barring of royalty payments for natural gas under the 1957-58 Conveyances.

---

[12] *See also* John G. Cameron, Jr., Michigan Real Property Law, Principles and Commentary, Third Edition, §2.15 (2005) ("Royalty clauses generally provide that the lessee will either deliver a percentage of the oil produced to the lessor's credit, free of cost, into tank reservoirs or into the pipeline to which the lessee may connect wells on the leasehold or pay the lessor a percentage of proceeds of production. The royalty interest delivered to the lessor by the lessee constitutes *consideration for the extraction and consequent diminution of value of the lessor's mineral estate*," emphasis added.)

16

### c. Lomree is Not Claiming the Minerals it Conveyed Away Under the 1957-58 Conveyances, but Rather Stored Gas

Under the 1957-58 Conveyances, Lomree conveyed to Pan Gas "all of the natural gas in and under the following described land." (Def.'s Ex. 1, D,I). While it is true that under the conveyances Lomree conveyed any interest in the natural gas contained beneath its parcels, the conveyances did not address gas brought by Pan Gas from other properties to be stored in the wells below the parcels. Accordingly, the conveyances do not affect the claimed right in this case, which is access to the gas extracted by Pan Gas from elsewhere and stored on Lomree's parcels.

### d. The Fact that the 1957 Contracts Only Specified Free Gas for Pan Gas and not Lomree Does Not Foreclose an Interpretation of ¶ 15 Granting Free Gas to Lomree

While it is true that the 1957 Contracts explicitly provide Pan Gas the right to free gas (Def.'s Ex. 1, E,J, ¶ 8) and do not specifically grant the same right to Lomree (as the 1946 Contracts did), this does not necessarily foreclose Lomree's right to free gas. Given the possibility that the right to free gas from the 1946 Contracts was preserved by ¶ 15 of the 1957 Contracts, the parties may have felt that re-stating Lomree's right to free gas in a separate provision was unnecessary and redundant.

### 4. The Ambiguity in ¶ 15 of the 1957 Contracts Warrants Consideration of the Parties' Course of Performance, Which Suggests that Lomree is Entitled to Continued Free Gas

Since ¶ 15 is susceptible to multiple interpretations and Pan Gas's additional arguments do not decisively make the contracts unambiguous, the Court will now consider extrinsic evidence to aid in deciphering the parties' intent. *O'Connor*, 218 N.W.

17

at 787. The Court acknowledges, as Pan Gas properly argues, that extrinsic evidence is not admissible to interpret a contract where the language is unambiguous, even when the language is contrary to a longstanding interpretation by the parties. *Michigan Chandelier Co. v. Morse*, 297 N.W. 64, 67 (1941). As noted above, however, the Court finds ¶ 15 of the 1957 Conveyances ambiguous, and will accordingly proceed to consider extrinsic evidence.

While Pan Gas's reliance on *Schroeder v. Terra Energy, Ltd.*, 565 N.W.2d 887 (Mich. Ct. App. 1997), a case similar in many respects to the case at bar, is not misguided, ultimately this case is distinguishable from *Schroeder*. In *Schroeder*, a lessor and lessee in an oil and gas lease disagreed about the meaning of the term "gross proceeds at the wellhead." *Id*. at 887. The lessee had mistakenly overpaid royalties to the lessor for three years based on its incorrect interpretation of the term. The court ultimately allowed the lessee to deduct post-production costs from its gross proceeds before making royalty payments, even though the parties' three-year course of performance was to the contrary. *Id*. at 896. In discussing its rejection of the extrinsic evidence urged by the lessor, the Court explained:

> While generally a course of performance is highly persuasive evidence of proper contract interpretation when introduced against the party so performing, the law also recognizes that a party may undertake a wrong interpretation of the words of a contract and the other party should never be permitted to profit by such mistake in the absence of an estoppel arising from a prejudicial change of position in good-faith reliance on such performance.
>
> * * *
>
> In the absence of ambiguity, rules of construction such as reliance on a course of performance are unnecessary to this

18

> Court's task and accordingly we regard such evidence as reflective of no more than a mistake on defendant's part and thus as ultimately irrelevant.

*Id*. at 895-6.  While the holding of *Schroeder* remains valid, this case is distinct in that, unlike the term "gross proceeds at the well," which the Court found to be unambiguous,[13] this Court finds that ¶ 15 of the 1957 Contracts is susceptible to multiple reasonable interpretations and is thus ambiguous.   While the holding of *Schroeder* applies to this Court, the facts in this case are distinct, resulting in an outcome that justifies the consideration of extrinsic evidence.

From the execution of the 1957 Contracts until Pan Gas notified Lomree of its intention to stop providing free gas in 2010, Pan Gas has had continuous access to free gas from the wells on its parcels without objection from Pan Gas, just as it had under the 1946 Contracts.   (Pl.'s Mot. at 2, Def.'s Answer ¶¶ 11, 16).   Pan Gas does not specifically state why it decided now, after 50 years, to cease providing the gas based on a new interpretation, but does say that it could have resulted from an incorrect interpretation of ¶ 15 or the failure to communicate information to its field personnel. (Def.'s Mot. at 17).

Under Michigan law, "the parties' practical interpretation of their contract, and their course of conduct under that contract, are entitled to great weight in interpreting

---

[13] The *Schroeder* Court was aided in its interpretation of "gross proceeds at the well" by numerous cases examining nearly identical language in other jurisdictions, as well as general economic principles and other statutory provisions that were strongly related. (*Schroder*, 565 N.W.2d at 892-95).  This Court does not benefit from such interpretive aids and is unaware of a case with a similar fact pattern.

ambiguous provisions of the contract." *Terry Barr Sales Agency, Inc. v. All-Lock Co., Inc.*, 96 F.3d 174, 180 (6th Cir. 1996) (applying Michigan law). Where contractual language is ambiguous, "the practical interpretation of the parties themselves is entitled to great, if not controlling, influence." *Detroit Greyhound Emp. Fed. Credit Union v. Aetna Life Ins. Co.*, 167 N.W.2d 274, 276 (Mich. 1969). *See also Switzer v. Pinconning Lumber Co.*, 26 N.W. 762, 764 (Mich. 1886) (where ambiguous, "the manner in which the parties themselves have treated it in carrying it into effect is entitled to great weight as affording a practical construction which the parties themselves have placed upon its intent and meaning").

Applying Michigan contract law, the parties' course of performance, wherein Lomree continued to receive free gas for over 50 years after the execution of the 1957 Contracts and 1957-58 Conveyances without objection by Pan Gas, suggests an interpretation of ¶ 15 in favor of Lomree.

### 5. The Ambiguity in ¶ 15 of the 1957 Contracts Warrants the Application of *Contra Proferentem*, Which Further Suggests that Lomree is Entitled to Continued Free Gas

It is well-established under Michigan contract law that ambiguities are to be construed against their drafter under the rule of *contra proferentem*. *Klapp*, 663 N.W.2d at 455; *De Bruyn Produce Co. v. Romero*, 508 N.W.2d 150 (Mich. Ct. App. 1993); *Quade v. Anderson*, 829 F.Supp. 220 (W.D. Mich 1993). However, the *Klapp* Court held that *contra proferentem* "should be viewed essentially as a 'tie-breaker,' to be utilized only after all conventional means of contract interpretation, including the consideration of relevant extrinsic evidence, have been applied and found wanting."

*Klapp*, 663 N.W.2d at 455.  As discussed in *Schroeder*, the court in *J.J. Fagan* affirmed that *contra proferentem* is applicable in oil and gas leases, essentially re-stating the rule by declaring that oil and gas leases are to be construed "for the benefit of the lessor and against the lessee."   *Schroeder*, 565 N.W.2d at 892 (citing *J.J. Fagan*, 226 N.W. at 681).

While it is possible for this case to be decided by solely considering the parties' course of performance and not relying on *contra proferentem*, the rule further reinforces the point that the ambiguity in ¶ 15 of the 1957 Contracts should be construed against Pan Gas, the drafter of the document (Pl.'s Mot. at 6), and in favor of Lomree.

### D.    Lomree's Request for Summary Judgment Pursuant to Fed. R. Civ. P. 56(f)(1) Is Granted

In addition to denying Pan Gas's Motion for Summary Judgment, Lomree asks in its brief for the Court to enter summary judgment for itself pursuant to Fed. R. Civ. P. 56(f)(1).   (Pl.'s Mot. at 7, 9).   This Court does have the ability to grant summary judgment for a non-moving party "after giving notice and a reasonable time to respond" if there is no genuine dispute as to material facts and the Court believes that the non-movant is entitled to judgment as a matter of law.  *Markva*, 168 F. Supp. 2d at 706-07; Fed. R. Civ. P. 56(f)(1).

Based on the foregoing discussion, the Court determines that no genuine issue of material fact exists that would alter the outcome of this case, and that Lomree is entitled to judgment as a matter of law.   Accordingly, the Court enters judgment in favor

of Lomree pursuant to Fed. R. Civ. P. 56(f)(1).[14]

## IV.  Conclusion

For the above-stated reasons Pan Gas's motion for Summary Judgment is DENIED and judgment is entered in favor of Lomree pursuant to Fed. R. Civ. P. 56(f)(1).


                    s/Nancy G. Edmunds
                    Nancy G. Edmunds
                    United States District Judge

Dated:  August 10, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 10, 2011 by electronic and/or ordinary mail.

                    s/Carol A. Hemeyer
                    Case Manager

---

[14] Fed. R. Civ. P. 56(f)(1) states that "after giving notice and a reasonable time to respond, the court may grant summary judgment for a nonmovant." Lomree requested judgment pursuant to Fed. R. Civ. P. 56(f)(1) in its Response Brief, thus giving Pan Gas notice. (Pl.'s Mot. at 7, 9). Pan Gas had the opportunity to respond to this request both in its Reply and at oral argument. The Court is satisfied that this constitutes notice and a reasonable time to respond as required under Fed. R. Civ. P. 56(f)(1). Judgment is accordingly entered without further delay.